# UNITED STATES DISTRICT COURT
# IN THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| Bernard Bates, | ) |
| | ) C/A No.: 3:09-2792-CMC |
| Plaintiff, | ) |
| | ) **OPINION AND ORDER** |
| v. | ) **ON MOTIONS FOR** |
| | ) **SUMMARY JUDGMENT** |
| Chase Home Finance, LLC, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on cross-motions for summary judgment. Dkt Nos. 30 & 31. For the reasons set forth below, the motion for summary judgment filed by Defendant Chase Home Finance ("Chase") is granted, and the motion for partial summary judgment filed by Plaintiff Bernard Bates ("Bates") is denied.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369

1

U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

**FACTS**

Bates initiated this action by filing a complaint in state court. Dkt. No. 1-1. Chase timely removed the action to this court based on the assertion of diversity jurisdiction, 28 U.S.C. § 1332. Dkt. No. 1. The complaint asserts multiple causes of action against Chase, all of which arise out of the parties' relationship as a mortgage lender and debtor. The relevant events are set forth below in the light most favorable to Bates.[1] Dkt. No. 1-1.

**Mortgage Loan.** On February 22, 2002, Bates purchased a home with a mortgage loan from Midland Mortgage Corporation. Dkt. No. 31-3 ¶ 3. To receive this loan, Bates entered into two agreements, a Note and a Mortgage Agreement. Dkt. Nos. 30-3, 30-4. The lender's rights were immediately assigned to Chase Manhattan Mortgage Corporation to which Chase, the Defendant in this case, is the successor by merger. *Id.*, Dkt. No. 30-2 ¶ 5.

---

[1] The court sets out the facts in the light most favorable to Bates because it has determined that Chase's motion should be granted, and Bates' motion should be denied.

Bates became delinquent in the course of repaying the loan.[2] Dkt. No. 39 at 1. Between July 2004 and July 2006, Chase sent Bates four acceleration warnings indicating that Bates was in default under the terms of the Mortgage Agreement. Dkt. No. 30-6. The last payment Chase received from Bates was on June 16, 2006 which was applied to his May 2006 overdue payment. Dkt. No. 30-2 ¶ 8. On July 26, 2006, Chase mailed the last of the four acceleration letters to Bates informing him that he was again in default. *Id.* The letter stated, "Your failure to cure the default within 30 days from the date of this notice will result in the entire balance [of the mortgage loan] becoming due and payable under the terms of the Note and Mortgage." Dkt. No. 30-6 at 7. In bold-faced type, the letter also stated, "**You Have 30 Days From the Date of This Notice to Cure the Default. Thereafter, Foreclosure Action Will Begin**." *Id.* at 8. On August 8, 2006, Chase sent Bates, at his request, a repayment plan which would have allowed Bates to reinstate his mortgage loan. Dkt. No. 30-2 ¶ 9. The first payment under this plan was due August 16, 2006 but was never received. *Id.*

**Destruction of Mortgaged Property and Insurance Claim.** On August 27, 2006, the mortgaged property was destroyed by fire. Dkt. No. 31-3 ¶ 5. Bates filed an insurance claim for the loss with his homeowner's insurance carrier, Auto Owner's Insurance Company ("Auto Owner's"). *Id.* ¶ 6. Auto Owner's requested a payoff statement from Chase for the mortgage loan October 3,

---

[2] In his complaint, Bates initially contended that he had complied with all agreements between himself and Chase. After Chase proffered evidence that Bates had, in fact, been delinquent in making mortgage payments on several occasions, Bates conceded that "he became delinquent during the course of repaying the mortgage." Dkt. No. 39 at 1. Bates does not proffer any more specific evidence as to the timing or extent of his delinquencies, neither does he challenge the veracity of the evidence Chase submitted on this point. The court, therefore, accepts Chase's evidence as to Bates' payment history.

2006 and on October 6, 2006 issued an insurance draft payable to Chase. Dkt. Nos. 39-1 and 39-2.[3] The record is silent as to whether the draft was received by Chase. It is, however, apparent that the draft never cleared. Because the draft never cleared, Auto Owner's issued a second draft to Chase on November 7, 2006.[4] Dkt. No. 39-3.

On November 14, 2006, Chase's loss draft department received the second draft and forwarded it to Bates with a letter requesting that Bates endorse the draft and authorize Chase to apply the proceeds to the mortgage loan. Dkt. Nos. 30-2 ¶ 13, 31-3 ¶ 9. Through a November 28, 2006 letter drafted by counsel, Bates returned the endorsed insurance draft to Chase, authorized the proceeds to be applied to the mortgage loan, and provided a check sufficient to pay off the balance on his mortgage loan. Dkt. No. 31-3 ¶ 10. Chase received the endorsed draft and additional funds on November 30, 2006. Dkt. No. 30-3 ¶ 14.

**Foreclosure Proceedings.** On October 20, 2006, between the time Chase had been contacted by the insurance company for a payoff statement and its receipt of the second draft, Chase referred Bates' mortgage for foreclosure and reported the foreclosure to the proper credit agencies.

---

[3] Bates has proffered these documents without proper authentication. Chase has not objected to the admissibility of these documents. Therefore, for purposes of this motion, the court considers these documents.

[4] Bates asserts that the first insurance draft was lost or misplaced by Chase and that when Auto Owner's asked about the draft Chase stated it was never received. Dkt. Nos. 22 ¶ 23 and 39-4 ¶ 7. As to the second draft, Bates asserts (1) it was sent by certified mail and despite Auto Owner's receipt of delivery confirmation, Chase initially informed Auto Owner's that the draft was not received; (2) it was not until after Auto Owner's contacted Chase that Chase admitted to receiving the second draft; and (3) these actions constitute mishandling of the second draft. Dkt. Nos. 31-3 ¶ 8, 39-4 ¶ 7.

These assertions are "supported" only by Bates' own affidavits which do not constitute proffers of admissible evidence because Bates concedes that he does not have personal knowledge of (1) when Auto Owner's mailed the insurance drafts or (2) communications between Auto Owner's and Chase about receipt of the drafts. Dkt. No. 39-4 ¶¶ 5-7.

4

Dkt. No. 30-2 ¶ 12. On November 20, 2006, after Chase received the second draft and forwarded it to Bates for endorsement, Chase initiated foreclosure proceedings by filing a Summons and Complaint for Foreclosure in Sumter County. Dkt. No. 22. On December 15, 2006, after receiving Bates' endorsement, authorization letter, and additional funds, Chase reported the mortgage loan to credit agencies as paid in full after having been in foreclosure. Dkt. No. 30-2 ¶ 15. Although the payoff of the mortgage loan was reported to credit agencies, the foreclosure action in court was not officially dismissed until April 2007.[5] Dkt. No. 39-4 ¶ 10.

Bates purchased a new home in December 2006. Dkt. No. 39-4 ¶ 12. He was only able to obtain a nonconforming mortgage with an interest rate of 12.5% *per anum* and a short maturity date to finance this purchase. Dkt. No. 31-4 ¶ 11. For purposes of this order, the court accepts that Bates' inability to obtain more favorable terms was caused or contributed to by Chase's actions as set forth above. Bates has been denied a mortgage loan to refinance his home by several mortgage lenders due to the foreclosure appearing on his credit report. *Id.* ¶ 13; Dkt. No. 39-5. Bates also believes that he was denied an employment opportunity in January 2009 due the foreclosure action on his credit report.[6] Dkt. No. 31-3 ¶ 15.

---

[5] The injuries that Bates arguably suffered resulted from the foreclosure appearing on his credit report and not from the court proceedings. His credit report reflects that the mortgage loan was paid in full as of December 15, 2006 but indicates that the mortgage had been in foreclosure. Dkt. No. 30-2 ¶ 15.

[6] Bates' belief that he was denied an employment opportunity is based on assumption rather than on any statement by a potential employer as explained in his deposition testimony. Dkt. No. 37-4 at 8 (when asked whether any "employer for which [he'd] applied for employment has either told [him] orally or in writing, since August of 2006, that [he'd] been denied employment because of [foreclosure information] in [his] credit report," Bates answered, "No.").

**DISCUSSION**

Based on the above factual allegations, Bates asserts five causes of action against Chase: (1) breach of contract; (2) breach of contract accompanied by a fraudulent act; (3) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"); (4) malicious prosecution; and (5) intentional infliction of emotional distress. Dkt. No. 22. Bates asserts that Chase's handling of the insurance proceeds and reporting of the loan delinquency and foreclosure to credit reporting agencies constituted a breach of the Mortgage Agreement and an unfair trade practice. Dkt. No. 22. Bates further argues that he was injured by Chase's delay in applying the insurance proceeds because he had to pay money in addition to the insurance proceeds to pay off the loan. *Id.* He also argues that the negative credit report forced him to pay a higher interest rate on a new home loan and caused him to lose an employment opportunity . *Id.*

Bates has moved for partial summary judgment "on the issue of liability" and as to some elements of damages, specifically, the additional monthly interest he has paid due to his inability to refinance his replacement home. Dkt. No. 31-3. Chase has moved for summary judgment with respect to all five of Bates' causes of action. For the reasons set forth below, the court grants Chase's motion for summary judgment and denies Bates' motion.

**I.      BREACH OF CONTRACT**

The contracts at issue are the Note and Mortgage Agreement which Bates entered in February 2006 with Chase's predecessor in interest. Dkt. Nos. 30-3, 30-4. Scattered throughout Bates' complaint and memoranda are allegations that Chase took several wrongful actions with respect to these contracts. For purposes of this order, the court will consider whether these various

6

actions, alone or in combination, constitute a breach.[7]

The alleged wrongful actions include: (1) "failing and refusing to timely accept funds that were tendered by [Auto Owner's];" (2) continuing with foreclosure when Chase knew or should have known that Bates was going to use insurance proceeds to pay off his mortgage loan; (3) failing to notify Auto Owner's that Chase needed authorization signed by Bates before Chase would accept the insurance proceeds; and (4) failing to receive and promptly post the insurance drafts when they were received. The court concludes that none of these actions constitutes a breach of contract either alone or in combination.

**Refusal to Timely Accept Funds.** In considering whether Chase acted in a timely manner in accepting the insurance funds, the court considers the delay between (1) when Chase first received the insurance proceeds and (2) when Chase applied those proceeds to pay off the balance of the loan.

The parties disagree as to when Chase first received a draft from Auto Owner's. Bates alleges that Auto Owner's sent insurance proceeds to Chase as early as October 7, 2006 and that Chase acted in breach of contract by mishandling the proceeds and not applying them to the mortgage loan until December 15, 2006. These allegations are supported only by Bates' own affidavits in which he admits to having no personal knowledge as to when or how Auto Owner's mailed insurance proceeds to Chase. Therefore Bates' averments do not constitute a proffer of admissible evidence. It follows that Bates' position as to the date of receipt is unsupported.[8] Chase

---

[7] Bates argues some of these acts constituted a breach of contract and some were fraudulent acts accompanying a breach. To simplify this order and give Bates the benefit of the doubt, all actions are first analyzed to determine whether they may constitute a breach of contract.

[8] In his affidavits Bates alleges that Auto Owner's sent an insurance draft on October 7, 2006 but that the draft never cleared. Dkt. Nos. 31-3 ¶¶ 6 and 7, 39-4 ¶¶ 5 and 6. Yet, Bates admits in the affidavits to having no personal knowledge of this October 7 mailing. *Id.* In his memorandum

maintains, and supports through proffered affidavit evidence, that it first received an insurance draft on November 14, 2006. Dkt. No. 30-2 ¶ 13. As this is the only proffer of admissible evidence on this issue, the court accepts that the check was received by Chase on that date.

After receipt of the funds on November 14, 2006, Chase sent the check to Bates for his endorsement and authorization to apply the insurance proceeds to the mortgage loan rather than to repair and restoration of the mortgaged property. Dkt. No. 30-2 ¶ 13. Bates responded, as requested, by letter dated November 28, 2006 which Chase received November 30, 2006. *Id.* at ¶ 14. Roughly two weeks later, on December 15, 2006, Chase reported Bates' mortgage as paid in full. *Id.* at ¶ 15.

These facts fail to establish a delay between when Chase received the insurance check and when it forwarded the check to Bates for endorsement and authorization.[9] Similarly, the facts reflect only a two week delay between Chase's receipt of the endorsed draft and supplemental funds and application of those funds to the mortgage loan and related reporting that the mortgage was paid in full. Nothing in these brief delays suggests breach of any provision of the Note or Mortgage Agreement. Indeed, these documents do not specify a time for receipt and application of insurance

---

in support of motion for summary judgment, Bates alleges that the October 7 draft "was either lost in the mail or lost by [Chase]," but this allegation is unsupported by any proffered evidence. Dkt. No. 31-1 ¶ 6.

In his affidavits Bates further alleges that Auto Owner's mailed a second insurance draft on November 7, 2006 by certified mail. Dkt. Nos. 31-3 ¶ 8, 39-4 ¶ 7. He alleges that, although Auto Owner's received delivery confirmation, Chase insisted it never received the November 7 draft and only admitted to receipt of the draft after being contacted by Auto Owner's. *Id.* Again, Bates admits in the affidavits that he has no personal knowledge of the November 7 mailing or the communications between Auto Owner's and Chase.

[9] Neither party has provided the court the exact date of the letter sent by Chase requesting endorsement and authorization. The facts suggest that it must have been mailed between Chase's receipt of the draft on November 14 and Bates' November 28 response.

8

funds. Given the absence of a specific provision, the court has assumed for purposes of this order that the implied covenant of good faith and fair dealing would require action within a reasonable time. Nothing in the short delays referenced above suggests a breach of such a covenant.

**Instituting and Continuing With Foreclosure.** The undisputed evidence establishes that: (1) Bates was delinquent on his mortgage payments several times before July 2006; (2) Bates requested a repayment plan to reinstate his mortgage loan in July 2006; (3) the first payment under the repayment plan was due August, 16, 2006; and (4) Bates never made a payment on the plan. Dkt. Nos. 30-2 ¶ 8 and 30-7. Therefore, by October 3, when Auto Owner's request for payoff information alerted Chase that the mortgage might eventually be paid off by insurance proceeds, Bates was already delinquent on his mortgage loan payments. Bates made no other payments before Chase instituted foreclosure proceedings on October 20, 2006.

The Mortgage Agreement between Bates and Chase states in pertinent part:

**9. Grounds for Acceleration of Debt**

>**(a) Default.** [Chase] may . . . require immediate payment in full of all sums secured by this Security Instrument if:
>(i) [Bates] defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment . . . .
>***
>**18. Foreclosure Procedure.** If [Chase] requires immediate payment in full under paragraph 9, [Chase] may foreclose this Security Instrument by judicial proceeding.

Dkt. No. 30-4 at 4. Bates never made his August 16, 2006 payment or any payments that came due after that date. Additionally, there is no evidence that Chase received a draft from the insurance company sufficient to pay off the mortgage balance before October 20, 2006, when Chase commenced foreclosure proceedings. Chase was, therefore, within its contractual rights to institute

9

these proceedings.

Chase may have been aware that insurance proceeds were likely to be made available to pay off the debt in the near future. Plaintiff has not, however, directed the court to any contractual provision or legal authority for the proposition that this knowledge would limit Chase's contractual right to foreclose. Therefore, instituting or continuing foreclosure proceedings even after Chase knew that Bates was likely to use insurance proceeds to pay off his mortgage did not breach the contract.[10]

**Borrower Authorization Requirement.** Bates alleges that he was injured because Chase failed to notify Auto Owner's that it would need Bates' endorsement and authorization before applying the insurance proceeds to the mortgage loan. To succeed on this claim Bates would have to show that Chase had an affirmative duty to inform Auto Owner's of the endorsement and authorization requirement. Bates has not directed the court to any contractual provision or legal authority for the proposition that Chase owed Bates a duty to inform Auto Owner's of this requirement.

Additionally, Bates suggests in his pleadings that requiring Bates to endorse and authorize the insurance check was, itself, a breach of contract. The Mortgage Agreement entered into by Chase and Bates specifies the parties' obligations in the event of a fire. Dkt. No. 30-4. It states in pertinent part:

> In the event of loss, [Bates] shall give [Chase] immediate notice by mail . . . . Each insurance company concerned is hereby authorized and directed to make

---

[10] The Mortgage Agreement explicitly states that the use of insurance proceeds to make mortgage payments does not affect future payments. Dkt. No. 30-4 at 3 ("Any application of [insurance] proceeds to the principal shall not extend or postpone the due date of the monthly payments . . . or change the amount of such payments . . . .").

payment for such loss directly to [Chase], instead of to [Bates] and to [Chase] jointly. All or any part of the insurance proceeds may be applied by [Chase], at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts . . . , and then to the prepayment of principal, or (b) to the restoration or repair of the damaged Property. "

*Id.* This provision authorized Auto Owner's to make insurance payments directly to Chase and states that Chase could have applied the insurance payment directly to the mortgage loan *at its option*. While requiring endorsement and authorization of the insurance payment by Bates may not have been necessary, because the insurance check from Auto Owner's was made payable solely to Chase[11] as authorized by the above provision, Bates has not shown how this measure violated the contract. Indeed, the measure appears to be one which is protective of the rights of the borrower. Neither has Bates directed the court to any contractual provision or legal authority for the proposition that Chase owed Bates a duty to deposit the check without seeking Bates' endorsement, even if not otherwise required. Given the absence of any contractual provision addressing this issue, the short delay which resulted, and the nature of the endorsement requirement (protective of the borrower), the court also concludes that requiring this procedure could not have breached the implied covenant of good faith and fair dealing.[12]

---

[11] Bates has proffered a copy of Auto Owner's transmittal of the insurance draft as Dkt. No. 39-3 which indicates that the insurance draft was made payable to Chase alone. As stated above, this document was not properly authenticated but Chase has not opposed it or proffered contradictory evidence.

[12] Chase proffered affidavit evidence that Bates contacted Chase on October 5, 2006 and that a Chase representative advised Bates to "send a fully endorsed insurance check with a written request that the proceeds be applied to pay off the Mortgage Loan." Dkt. No. 30-2 ¶ 11. Bates has not proffered any contrary evidence. Therefore, even before the first draft was allegedly mailed to Chase by Auto Owner's in October 2006, Bates was aware that his endorsement and authorization to apply insurance proceeds to the debt was required by Chase. There is no evidence that Bates took issue with this requirement at the time. While not necessary to the court's conclusion, this early knowledge on Bates' part and absence of objection further supports the conclusion that Chase's later

**Failure To Promptly Post Insurance Drafts Upon Receipt.** As noted above, Bates does not point to any contractual provision imposing a time limit within which Chase was required to apply insurance proceeds to the debt. The record establishes that Chase did not receive the endorsed check and supplemental payment until November 30, 2006. Chase reported the mortgage as paid in full two weeks later, on December 15, 2006. In the absence of an express provision, this two week delay cannot be considered a breach of an express term of the contract. Neither can such a short delay constitute a breach of the implied covenant of good faith and fair dealing.

**Combined Actions.** None of Chase's actions (or inactions) Bates alleges were improper constituted a breach of contract. This is true whether considered independently or in combination. Therefore, the court grants Chase's motion for summary judgment as to Bates' breach of contract claim.

## II. BREACH OF CONTRACT ACCOMPANIED BY FRAUDULENT ACT

In the absence of a breach of contract, no cause of action arises for breach of contract accompanied by fraudulent act. *Smith v. Canal Ins. Co.*, 269 S.E.2d 348, 350 (S.C. 1980) ("There is no cause of action distinct from breach of contract for breach of contract accompanied by fraudulent act."). Therefore, because the actions alleged by Bates did not constitute breach of contract, Chase is entitled to summary judgment on the claim of breach of contract accompanied by fraudulent act.

## III. VIOLATION OF SCUTPA

Bates argues that Chase violated the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*, in that it "undertook various ways in which to delay accepting payoff

---

actions were not in breach of contract.

12

proceeds, thus increasing the amount of funds received by [Chase]. Further the action by [Chase] in reporting the delinquency of the account to the credit bureaus was also a violation . . . ." Dkt. No. 22 ¶¶ 27-30. The actions Bates alleges caused the delays are the same actions he argues were breaches of contract discussed in Section I above.

SCUTPA declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20. To be actionable under SCUTPA, the unfair or deceptive act or practice must also have an impact upon the public interest. *Crary v. Djebelli*, 496 S.E.2d 21, 22-23 (S.C. 1998). "An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is 'deceptive' when it has a tendency to deceive." *Johnson v. Collins Entm't Co., Inc.*, 564 S.E.2d 653, 636 (S.C. 2002). It is not enough to allege facts which amount to more than a breach of contract or negligent act. *See e.g.*, *Clarkson v. Orkin Exterminating Co., Inc.*, 761 F.2d 189, 191 (4th Cir. 1985) (holding that mere negligence does not have the "capacity or effect or tendency to deceive" required for a SCUTPA violation); *Columbia East Assocs. v. Bi-Lo*, 386 S.E.2d 259, 263 (S.C. Ct. App. 1989) ("breach of a valid contract, without more, does not constitute a violation of [SCUTPA]").

As noted above, the actions alleged did not constitute a breach of contract. Bates has not alleged nor has he proffered evidence that Chase's actions were taken negligently much less that they were "immoral, unethical, or oppressive" or presented a tendency to deceive. Additionally, for reasons explained above, Chase was within its rights to commence foreclosure proceedings when it did so and to report the proceedings to credit agencies. Bates has offered no evidence or argument which would establish that these actions were either unfair or deceptive. Because Chase's actions were not unfair or deceptive, the court need not decide whether the actions affected the public

13

interest.[13] The court, therefore, grants Chase's motion for summary judgment as to Bates' SCUTPA claim.

## IV.  MALICIOUS PROSECUTION

Bates argues that Chase acted with malice in filing the foreclosure action. In order to maintain an action for malicious prosecution, a plaintiff must show: (1) institution or continuation of original judicial proceedings, either civil or criminal; (2) by, or at the instance of the defendant; (3) termination of such proceedings in his favor; (4) malice in instituting the proceedings; (5) lack of probable cause; and (6) resulting injury or damage. *Jordan v. Deese*, 452 S.E.2d 838, 839 (S.C. 1995).

Bates cannot show at least two of the elements. First, for the reasons stated above, Chase had probable cause to institute the foreclosure action because Bates had become and remained delinquent on his mortgage payments throughout the relevant time frame. Indeed the Mortgage Agreement authorized Chase to commence foreclosure actions if just one payment was overdue. Here it is undisputed that Bates was delinquent multiple times before the foreclosure was instituted and failed to abide by a repayment plan which he requested. Second, the foreclosure action was not terminated in Bates' favor, at least not in the sense of showing Chase failed to establish its right to foreclose. Instead, the foreclosure action was dismissed because Bates eventually paid his loan in full rendering the action moot. Because Bates cannot meet at least two elements of the cause of action, the court grants Chase's motion for summary judgment as to Bates' malicious prosecution claim.

---

[13] Chase also argues that Bates' SCUTPA claim is preempted by the Fair Credit Reporting Act. Because the court finds that Bates' allegations do not meet the elements of a SCUTPA claim, the court need not reach the preemption issue.

14

## V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Bates alleges that Chase's institution of foreclosure proceedings constituted intentional infliction of emotion distress. To state a claim for intentional infliction of emotional distress, a plaintiff must show: "(1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." *Bergstrom v. Palmetto Health Alliance*, 596 S.E.2d 42, 48 (S.C. 2004).

Chase's conduct in exercising its contractual rights to foreclose on Bates' mortgage when he missed multiple payments cannot be considered "so extreme and outrageous as to exceed all possible bounds of decency." Merely filing a foreclosure action is not conduct which meets the standard. *See e.g.*, *Save Charleston Found. v. Murray*, 333 S.E.2d 60 (S.C. Ct. App. 1985) (holding that conversion of a promissory note after payments were overdue would not support a claim for outrage). Additionally, Bates has failed to proffer evidence to suggest that he has suffered severe emotional distress. In deposition testimony, Bates stated that he has trouble sleeping but has no other emotional trauma. Dkt. No. 30-8 at 17. The court, therefore, grants Chase's motion for summary judgment as to Bates' claim for intentional infliction of emotional distress.

## CONCLUSION

For the reasons stated above, the court grants Chase's motion for summary judgment with respect to each of Bates' claims and denies Bates' motion for partial summary judgment as to

liability and certain damages.

    **IT IS SO ORDERED.**

                                                s/ Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
December 6, 2010